IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA 25-1073

Filed 15 July 2026

Wake County, No. 23CV012649-910

ASHLEY SEPANSKI, Plaintiff,

v.

ASHLEIGH FISHER CONSULTING, LLC, Defendant.

Appeal by Defendant from judgment entered 12 December 2024 by Judge Rebecca W. Holt in Wake County Superior Court. Heard in the Court of Appeals 20 May 2026.

*Ryan Hayden Smith for Plaintiff-Appellee.*

*Davis Hartman Wright LLP, by M. Brad Hill, for Defendant-Appellant.*

GRIFFIN, Judge.

Defendant Ashleigh Fisher Consulting, LLC, appeals from the trial court's order. The trial court granted Plaintiff Ashley Sepanski's motion for summary judgment on Plaintiff's breach of contract and breach of implied covenant of good faith and fair dealing claims. The trial court also denied Defendant's motion for summary judgment. Defendant argues the trial court erred by relying on Plaintiff's interpretation of the contract because Defendant fulfilled all its obligations and acted in good faith. We agree with Defendant and reverse.

## I. Factual and Procedural Background

In August 2022, Defendant, a small consulting firm, contacted Plaintiff *via* LinkedIn to inquire about her consulting services. After a preliminary discussion, Defendant sent its standardized draft agreement to hire Plaintiff as an independent contractor. In response, Plaintiff sent a revised version of the agreement containing redlines and an attachment labeled "Appendix A." The parties then negotiated the terms of the agreement until the agreement was fully executed on 29 August 2022. This agreement remains the only contract between the parties.

Plaintiff immediately began working with Defendant's client, Doral Investors Group. On 30 August 2022, Plaintiff sent an invoice for her "September Monthly Retainer Fee." Defendant paid this invoice.

The parties' agreement included the following provisions:

3.1 Compensation. Company agrees to pay Consultant a fee as defined in sections 3.1.1 and 3.1.2. A record of Consultant's time and work for which Consultant should be compensated is to be maintained and reported by Consultant to Company in a timeframe and format designated by Company. Consultant shall additionally submit an invoice to company on a monthly basis.

3.1.1 Client-Related Compensation. Compensation for consulting service related to a client engagement shall be as designated in an addendum to this agreement (Appendix A). Payment to Consultant will be made within ten (10) business days of receipt by Company of Consultant's invoice.

Appendix A, Plaintiff's incorporated revision, describes the payment schedule:

A2.1 *Consulting services provided* are estimated to require a total billable time of approximately 20 hours per week, for which it is agreed that the Consultant will submit an *invoice with monthly retainer fee* in the amount of $17,000.00 on or before the first of the month.

(Emphasis added).

Plaintiff drafted a second invoice on 28 September 2022, for an "October Retainer Fee" and "Additional time as discussed." Defendant received this invoice on 13 October 2022.

On 18 October 2022, Defendant terminated Plaintiff's work on the Doral project. Doral expressed it was "unhappy with [Plaintiff's] performance and w[as] concerned with the value [it was] receiving relative to the cost." Defendant offered to keep Plaintiff's contract active for projects with other clients, but Plaintiff declined. Plaintiff did not perform any more work for Defendant after this. Defendant sent Plaintiff an email confirming the termination of the contract, indicating it would pay Plaintiff's October invoice, and told her not to send further invoices. Plaintiff acknowledged her termination, but also inquired about her payment during the termination notice period. Defendant reiterated it would not accept any new invoices since Plaintiff did not do any further work during the termination notice period. Sometime thereafter, Defendant paid the October invoice.

The agreement contained the following termination notice period provision:

7.2 Early Termination. Either party upon sixty days (60) of written notice may cancel this Agreement. In such case, Company will pay Consultant only for the *work completed* through the end of the notice period and any expenses incurred by Consultant on Company's behalf, in accordance with Section 3 (Compensation and Expenses).

(Emphasis added).

Plaintiff then sent a demand letter to Defendant asserting it was in breach of the contract's Section 7.2 Early Termination provision. Plaintiff filed her complaint alleging breach of contract and breach of implied covenant of good faith and fair dealing. Plaintiff requested damages in the amount of $34,000: the monthly retainer fee payments during the sixty-day termination notice period.

Defendant filed a motion for summary judgment on 3 October 2024, and Plaintiff filed her response and cross motion for summary judgment about a month later. After a hearing on the motions, the trial court granted Plaintiff's motion for summary judgment on 12 December 2024. **{R. p. 75}**. The trial court determined no material issue of fact existed and entered judgment against Defendant for $26,633.33.

Defendant timely appealed.

## II.    Analysis

The standard of review for an appeal from summary judgment is *de novo*. *In re Will of Jones*, 362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008) (citing *Forbis v. Neal*, 361 N.C. 519, 523–24, 649 S.E.2d 382, 385 (2007)). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. R. Civ. P. 56(c) (2023). A summary judgment ruling must consider the evidence in the light most favorable to the non-moving party. *Morrell v. Hardin Creek, Inc.*, 371

N.C. 672, 680, 821 S.E.2d 360, 366 (2018) (citing *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000)).

Contract interpretation is a matter of law. *Advisor L., LLC v. Holland*, --- N.C. App. ---, ---, 927 S.E.2d 39, 43 (2026) (citation omitted); *Shelton v. Duke Univ. Health Sys., Inc.*, 179 N.C. App. 120, 123, 633 S.E.2d 113, 115 (2006) (citing *Internet East, Inc. v. Duro Communs., Inc.*, 146 N.C. App. 401, 405, 553 S.E.2d 84, 87 (2001)). Thus, courts "may enter summary judgment in contract disputes because they have the power to interpret the terms of contracts," *McKinnon v. CV Indus., Inc.*, 213 N.C. App. 328, 333, 713 S.E.2d 495, 500 (2011) (citing *Hodgin v. Brighton*, 196 N.C. App. 126, 128, 674 S.E.2d 444, 446 (2009)), and determine whether the language of a contract is ambiguous, *Morrell*, 371 N.C. at 680, 821 S.E.2d at 366.

First, Defendant argues the trial court erred by interpreting the contract under Plaintiff's definition of "retainer" because it is not consistent with the contract's plain language. Defendant argues its own interpretation—where the payment schedule is based on work completed—should prevail because it harmonizes the provisions of the contract and is consistent with contract interpretation principles.

Second, Defendant argues the trial court should have granted Defendant's motion for summary judgment because it fulfilled its obligations under the agreement. Defendant purports, even under Plaintiff's interpretation, the condition precedent to payment was not met.

## A. Contract Interpretation for the Breach of Contract Claim

The purpose of contract interpretation is to ascertain the intent of the parties at execution. *Lane v. Scarborough*, 284 N.C. 407, 409–10, 200 S.E.2d 622, 624 (1973) (citations omitted). To ascertain the parties' intent, we start the interpretation analysis with the plain language of the contract wherein "[u]ndefined words are given their ordinary meaning consistent with the context in which the term is used." *North State Deli, LLC v. Cincinnati Ins. Co.*, 386 N.C. 733, 740, 908 S.E.2d 802, 808–09 (2024) (citation omitted). This Court may consult standard, nonlegal dictionaries to discern the ordinary meaning, which is used "unless it is apparent another meaning is intended." *Peirson v. Am. Hardware Mut. Ins. Co.*, 249 N.C. 580, 583, 107 S.E.2d 137, 139 (1959).

If the contract language is clear and unambiguous, "effect must be given to its terms." *Weyerhaeuser Co. v. Carolina Power & Light Co.*, 257 N.C. 717, 719, 127 S.E.2d 539, 541 (1962). However, "[a]n ambiguity exists in a contract when either the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations." *Galloway as Tr. of Melissa Galloway Snell Living Tr. Dated May 1, 2018 v. Snell*, 384 N.C. 285, 288, 885 S.E.2d 834, 836 (2023) (citation omitted). The mere "fact that a dispute has arisen as to the parties' interpretation . . . is *some* indication that the language of the contract is, at best, ambiguous." *Gay v. Saber Healthcare Group, LLC*, 271 N.C. App. 1, 7, 842 S.E.2d 635, 640 (2020) (emphasis added) (quoting *Salvaggio v. New Breed Transfer Corp.*, 150 N.C. App 688, 690, 564 S.E.2d 641, 643 (2002)).

When discerning the meaning of contract terms, "[w]here the immediate context in which words are used is not clearly indicative of the meaning intended, resort may be had to other portions . . . to bring them into harmony." *Wachovia Bank & Tr. Co. v. Westchester Fire Ins. Co.*, 276 N.C. 348, 355, 172 S.E.2d 518, 522 (1970). "[A] contract must be considered as an entirety. The problem is not what the separate parts mean, but what the *contract* means when considered as a whole." *Meehan v. Am. Media Int'l, LLC*, 214 N.C. App. 245, 256, 712 S.E.2d 904, 911 (2011) (citation omitted). Further, "[i]ndividual clauses in an agreement and particular words must be considered in connection with the rest of the agreement." *Robbins v. C. W. Myers Trading Post, Inc.*, 253 N.C. 474, 477, 117 S.E.2d 438, 440–41 (1960) (citation omitted).

The Court may also look at "[e]vidence of statements and conduct by the parties after executing a contract" to determine the practical meaning the parties attributed to the contract terms. *Heater v. Heater*, 53 N.C. App. 101, 104, 280 S.E.2d 19, 21 (1981) (citation omitted). "Parties are far less liable to have been mistaken as to the meaning of their contract during the period while harmonious and practical construction reflects that intention." *Peaseley v. Virginia Iron, Coal & Coke Co.*, 282 N.C. 585, 601, 194 S.E.2d 133, 144 (1973) (citation omitted). "The parties are presumed to know the intent and meaning of their contract better than strangers." *Davis v. McRee*, 299 N.C. 498, 502, 263 S.E.2d 604, 607 (1980). However, "[i]t is not

the understanding or intent of one of the parties that controls the interpretation." *Vestal v. Vestal*, 49 N.C. App. 263, 268, 271 S.E.2d 306, 310 (1980) (citation omitted).

**B. The Contract's Plain Meaning**

Defendant contends the trial court erred by relying on Plaintiff's interpretation of the word "retainer" as a means to secure someone's availability. Instead, Defendant argues the retainer payments functioned as an advance on billable work, directly connected to Plaintiff's consulting services actually provided.

Defendant points to the language in the termination notice period which said, "Company will pay Consultant only for the *work completed*." In contrast, Plaintiff argues a plain text reading of the payment provisions in the agreement required a monthly fee to secure Plaintiff's availability. We now turn to the contract interpretation analysis.

### *1. The Contract Language Used*

In the contract, "retainer" appears solely in Appendix A2.1: "the Consultant will submit an invoice with monthly *retainer* fee." Since the word "retainer" is undefined in the contract, this Court consults standard, nonlegal dictionaries to ascertain the plain meaning of the word. Merriam-Webster defines retainer as "a fee paid to a lawyer or professional adviser for advice or services or for a claim on services when needed." Retainer, Merriam-Webster, https://www.merriam-webster.com/dictionary/retainer (last visited June 23, 2026). The Oxford English Dictionary defines retainer as "a sum paid to secure a person's services as and when

required." Retainer, Oxford English Dictionary, https://www.oed.com/dictionary/retainer_n1?tl=true&tab=meaning_and_use (last visited June 23, 2026). The Cambridge Dictionary defines retainer as "an amount of money that you pay someone so as to be sure that that person can work for you when you need them to." Retainer, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/retainer (last visited June 23, 2026).

These dictionary definitions all include some service in exchange for compensation. For each definition, there is an expectation that work will come: "for advice or services;" "as and when required;" and "to be sure that person can work." Here, however, upon early termination, there was no expectation for any future work. When Defendant informed Plaintiff her work with Doral was done, Defendant offered to keep the contract active in the event Defendant could staff her on another project. Plaintiff declined. That same day, Defendant sent Plaintiff an email confirming termination and told her not to send any more invoices because there would not be any further client work to invoice for. At her choice and decision, Plaintiff had notice her services were no longer required and there would not be any additional work for her to complete.

Although Plaintiff contends in her deposition the retainer fee was for her availability for the sixty-day termination period, in discussing what the advanced payment was based upon, she states:

> The advance would be based upon [Defendant's] *estimate that the work that I was to accomplish* would be approximately in at least 20 hours per week . . . so therefore, $17,000 in advance says to me that there would be 80-ish hours per month available for me to work and he instead of dealing with hourly, wanted to pay a cumulative sum to make it easier and the 17,000 would then cover the estimation of 20 hours per week that he would have available for work.

(Emphasis added).

This explanation provides context on the payment expectations between the parties. Plaintiff believed this retainer would be a substitute "instead of dealing with hourly" for an "estimate [of] the *work [Plaintiff] was to accomplish*." This statement tends to show Plaintiff knew the retainer was directly connected to the future accomplishment or her completion of estimated work.

Other provisions of the contract align with Defendant's definition of retainer as an advance on future billable work. Section 3 states: "[a] record of Consultant's time *and work* for which consultant should be compensated is to be maintained and reported." The termination terms in Section 7.2 outline Plaintiff's payment "only for the *work completed*." In the Appendix, the compensation section begins with "[c]onsulting *services provided*," not availability or mere time. These provisions demonstrate that Plaintiff should have received payment for her *completed* and *provided work*.

Here, Plaintiff's purported definition of "retainer" as relying solely on availability would not be harmonious with other sections of the contract. The "retainer" language is not ambiguous and effect must be given to the contract's terms

altogether.  *See Weyerhaeuser Co.*, 257 N.C. at 719, 127 S.E.2d at 541.  We hold Defendant did not have the obligation to pay the retainer fee during the termination notice period.

### 2.  *Conduct After Execution*

For additional assistance in understanding the parties' intent, this Court may look to conduct of the parties after a contract is executed.  *Heater*, 53 N.C. App. at 104, 280 S.E.2d at 21.

While Appendix A reads the Consultant will submit an invoice with the monthly retainer fee "on or before the first of the month," in practice, Plaintiff submitted her invoices inconsistently.  In accordance with Appendix A, the first invoice for Plaintiff's "September Fee" was sent on 30 August 2022.  However, the second invoice was not sent until the middle of October for Plaintiff's "October Retainer Fee."  Further, the contract provides Defendant with ten business days to pay the invoice, which means payment is not mandated nor has been completed consistently in practice "on or before the first of the month."  In analyzing the parties' conduct, the retainer payment was consistently sent after Plaintiff had completed at least *some* work for Defendant's client.

Post-execution conduct by the parties highlights a payment structure that was inconsistent with a retainer to be paid solely for availability.  Even if Plaintiff intended for the retainer fee to be an advance for availability, the intent of one party does not control, *Vestal*, 49 N.C. App. at 268, 271 S.E.2d at 310; instead, in looking at

both parties' conduct, the contract was not executed with payment solely for Plaintiff's availability in mind.

**C. Defendant Fulfilled Its Obligations Under the Agreement**

A breach of contract claim requires that terms of the agreement be breached. *McKinnon*, 213 N.C. App. at 333, 713 S.E.2d at 500. Here, Defendant did not breach the contract because its actions were consistent with what was required of it during the termination notice period. Defendant did not have to compensate Plaintiff because Plaintiff did not complete any further work for the company as required for payment during the notice period.

## III.    Conclusion

We hold the trial court erred by granting Plaintiffs' breach of contract claim because the payment structure is determined by work completed. Based upon this definition, Defendant did not breach the contract nor breach the implied covenant of good faith and fair dealing. We reverse the trial court's grant of summary judgment for Plaintiff, vacate that order, and remand for entry of summary judgment for Defendant.

REVERSED AND REMANDED.

Judges TYSON and ARROWOOD concur.